## Case No. 11,035.

PETERS et al. v. WARREN INS. CO.

[3 Sumn. 389;[1] 1 Law Rep. 281; 1 Hunt, Mer. Mag. 67.]

Circuit Court, D. Massachusetts. Oct. Term, 1838.

MARINE INSURANCE — PERIL OF THE SEA — COLLISION IN FOREIGN WATERS — APPORTIONMENT — SENTENCE OF FOREIGN COURT.

1. Where a collision between two ships accidentally took place within the dominions of a foreign power, and by the laws of that foreign power, all damages occasioned thereby were to be borne equally by the two vessels; *held*, that such a collision was a peril of the seas, within the meaning of the common policy of insurance; and that the underwriters were liable, not only for the direct damage done to the ship insured by them, but also for the charge apportioned on such ship as her contributory share towards the common loss, not as a general average, but as properly a part of the partial loss occasioned by the collision.

[Cited in Emery v. Huntington, 109 Mass. 437; Indianapolis Ins. Co. v. Mason, 11 Ind. 179, 180. Cited in brief in Forbes v. Manufacturers' Ins. Co., 1 Gray, 372.]

2. Such a charge is a part of the loss within the maxim, "Causa proxima, non remota, spectatur." General average can be only, where there is some voluntary sacrifice or voluntary expense incurred for the common benefit.

3. The maxim, "Causa proxima, non remota, spectatur," is not of universal application in the law; and does not exclude incidental losses, flowing as a legal or natural consequence from the direct injury or loss to the thing insured.

[Cited in McDonald v. Snelling, 14 Allen, 296; Marble v. City of Worcester, 4 Gray, 409.]

4. Semble, that a loss by an accidental collision of two vessels, without fault on either side, is not a case of general average according to our law; but of particular average.

[Cited in Broadwell v. Swigert, 7 B. Mon. 39.]

5. The sentence of a foreign court, of competent jurisdiction, acting in rem, is conclusive in respect to the matter, on which it directly decides.

This was a case on a policy of insurance, dated the first day of April, 1836, whereby the defendants insured the plaintiffs, for whom it may concern, payable to them, eight thousand dollars' on the ship Paragon, for the term of one year, commencing the risk on the 15th day of March, 1836, at noon, at a premium of five per cent. The declaration alleged a loss by collision with another vessel, without any fault of the master or crew of the Paragon; and also insisted on a general average and contribution. At the

---

[1] [Reported by Charles Sumner, Esq.]

trial, the parties agreed to a statement of facts, as follows: "The plaintiffs are owners of the ship Paragon, insured by the defendants in part. On the 10th of November, 1836, said vessel sailed from Hamburg in ballast, for Gottenburg, to procure a cargo of iron for the United States. Whilst proceeding down the Elbe, with a pilot on board, she came in contract with a galiot, called the Franc Anna, and sunk her. The Paragon lost her bowsprit, jib-boom, and anchor, and sustained other damages, which obliged her to go into Cuxhaven, a port at the mouth of the Elbe, and subject to the jurisdiction of Hamburg, for repairs. Whilst lying there, the captain of the galiot libelled the Paragon in the marine court; alleging that the loss of the vessel was caused by the carelessness or fault of those on board the Paragon. The ship was arrested, but subsequently released on security being given by the agents of the owners to respond to such damages as should be awarded by the court. The captain of the Paragon, in his answer, denied the charges of carelessness or fault on the part of those on board of his ship; and the court, after hearing the parties and their proofs, decided that the collision was not the result of fault or carelessness on either side; and that, therefore, according to article 1, tit. 8, of the marine law of Hamburg, the loss was a general average loss, and to be borne equally by each party; that is, the Paragon was to bear one half of the expense of her own repairs, and to pay one half of the value of the galiot; and the galiot was to bear the loss of one half of her own value, and to pay one half of the expense of the repairs of the Paragon. In conformity with this decision, a general average statement was drawn up by Mr. Oldermann, the despacheur of Hamburg, an officer appointed by law, and by whom alone such statements can be prepared. In this statement are charged, first, the expenses of repairing the Paragon, after making the deduction of one third, new for old—saving one of her anchors and chains, which was lost at the time of the collision; wages and provisions of the captain and crew during the detention, and the expenses of surveys, protest, defending the suit, &c., amounting in all to about eight hundred dollars; and one half of which is charged to the Paragon, and one half to the galiot. Secondly, are charged the value of the galiot, as by appraisal, under an order of court; of her freight and cargo; the expenses of surveys, protest, prosecuting the suit, &c.—amounting, in all, to about six thousand dollars; one half of which is to be charged to the Paragon." The statement concludes thus; "Which, according to the before-mentioned ordinance, relating to insurance and average, is to be borne by ship, cargo, and freight, as general average. The ship Paragon has to claim from the Franc Anna for half the damages, say $400; and the Franc Anna from the Paragon, one half

the damages, say $3000; so that the Paragon must pay $2600,—which amount the tribunal of commerce decreed should be paid instanter. The owners of the Paragon having no funds in Hamburg, the captain was obliged to raise the money on bottomry. There being no cargo on board of the Paragon, and no freight earned, the ship had to bear the whole of the general average loss."

F. C. Loring, for plaintiffs.
Mr. Parsons, for defendants.

STORY, Circuit Justice. There is no doubt, in this case, that the actual injury sustained by the Paragon, is a loss for which the underwriters would be liable, if it amounted to five per cent. There is as little doubt, as the Paragon was obliged to go into the port of Cuxhaven for repairs, that, according to the established principles of our law, differing on this point from that of England, the wages and provisions of the crew during the detention for the repairs is a general average. The only real question in controversy between the parties is, whether the underwriters are in this case liable for the sum decreed by the tribunal at Hamburg, to be paid by the Paragon, as her contributory share of the loss occasioned by the collision, either as a general average, or as a direct consequence of the collision, and a loss occasioned thereby. Some things are now well settled, which were formerly subject to some controversy among jurists. In the first place, the sentence or decree of the marine tribunal of Hamburg, being a court of competent jurisdiction in the premises, must be taken to be conclusive, as to the cause and amount of the loss, and of the contribution to be made by the parties. The collision happened within the territorial jurisdiction of Hamburg, and therefore the case was one within the competency of its judicial tribunals, and to be rightfully governed by its laws. However true it may be, that the city of Hamburg has no authority to prescribe to the rest of the world, what shall be deemed, in the maritime law, a general average; yet it cannot well be doubted, that it has full authority to make laws on the subject of collisions within its own territorial domains, which shall be obligatory on all vessels which choose to come within those domains. The ordinance of Hamburg (title 8, arts. 1, 2), has prescribed the rules on this subject; and has declared that in cases of collision of vessels, occurring accidentally, the damage shall be apportioned upon both the vessels, their freights and cargoes, as in other cases of general average ("communen avarien"), and shall be borne one half by each vessel. See Stev. & B. Av. by Phillips, 146, 367, 383. The sentence of the marine court of Hamburg has decided, that the collision in the present case was accidental, and not by the fault of either party; and has apportioned the damage accordingly between the two vessels. And that sentence

I take to be conclusive in both respects, upon the general principle now universally established, that the sentence of a foreign court of competent jurisdiction, acting in rem, is conclusive in respect to the matters, on which it directly decides. The original proceeding was here in rem, and precisely the same as our own courts of admiralty would have exercised in rem, in a case of collision within our own jurisdiction.

In the next place, it is now well settled, that when a case of general average occurs, if it is settled in the foreign port of destination, or in any other foreign port, where it rightfully ought to be settled, the adjustment there made will be conclusive as to the items, as well as the apportionment thereof upon the various interests, although it may be different from what our own law would have made, in case the adjustment had been made on a like collision in our own ports. The cases, cited at the bar on this point, are entirely satisfactory and conclusive. See especially Simmonds v. White, 2 Barn. & C. 805; Dalglish v. Davidson, 5 Dowl. & R. 6; Loring v. Neptune Ins. Co., 20 Pick. 411; Thornton v. U. S. Ins. Co., 3 Fairf. [12 Me.] 153; Strong v. New York Fireman's Ins. Co., 11 Johns. 322; Depau v. Ocean Ins. Co., 5 Cow. 63; 3 Kent, Comm. lect. 47, p. 244; 2 Phil. Ins. (1st Ed.) p. 255, 260; Id. (2d Ed., 1840) pp. 140, 141.

But the question still remains, whether, in the sense of the general maritime law, or, at all events, in the sense of our law, the present is a case of general average, to which the doctrine is properly applicable, so far as to make the underwriters liable therefor. It certainly cannot be considered as strictly falling under the ordinary definition of general average, where a sacrifice is voluntarily made for the benefit of all concerned; such as in cases of jettison, and ransom, and expenses by capture. By the law of England it seems clear that a loss of this sort, that is, by an accidental collision, without fault on either side, is a particular average, to be borne by the injured parties themselves; and it is not the subject of apportionment, or contribution, or of general average in any form. Lord Stowell so lays down the doctrine in the case of The Woodrop Sims, 2 Dod. 85, and so does Lord Tenterden, in his work on Shipping (part 3, c. 8, § 12). In this respect the law of England follows the Roman law. "Si navis tua, impacta in meam scapham, damnum mihi dedit, quæsitum est quæ actio mihi competeret? Et ait Proculus, si in potestate nautarum fuit, ne id accideret, et culpa eorum factum sit, lege Aquilia, cum nautis agendum." Dig. lib. 9, tit. 2, 1. 29, § 2. "Sed si tanta vis navi facta sit, quæ temperari non potuit; nullam in dominum dandam actionem." But in many if not in most of the maritime nations of continental Europe, the rule prevails, that the damage shall be equally apportioned between the vessels. A summary of many of the ordinances will be found in Jac. Sea Laws, bk. 4, pp. 324, 342, c. 1; in 1 Emerig. Ins. c. 12, § 14; in 2 Valin, Comm. lib. 3, tit. 7, art. 10; in Abb. Shipp. pt. 3, c. 8, § 12; and in 1 Bell, Comm. (4th Ed.) pp. 489, 490, §§ 518–520. In the ordinance of Louis XIV., in 1681, it is expressly declared, that, in cases of collision of ships, the damage shall be equally borne by the ships which have done it, and suffered it, whether on the voyage, or in the roads, or in port. Valin speaks of it, indeed, as a common average between the two vessels ("Le dommage causé par l'abordage est jugé avarie commune pour les deux navires"); but I do not know, that he is to be interpreted to mean a general average in the sense of the maritime law, as his words rather refer to an apportionment of the damage. If I were compelled to decide this question by the lights, which are now before me, I must confess, that the inclination of my opinion would be, that it is not a case of general average according to our law, but that it is a case merely of particular average. Emerigon considers all losses by collision to be merely a simple average. Dig. lib. 9, tit. 2, 1. 29, § 4; 1 Emerig. Assur. (Ed. 1827) pp. 409, 414, c. 12, § 14, notes 1, 4. See, also, 1 Bell, Comm. (4th Ed.) p. 492, § 520.

The real question, however, upon which this case turns, is, whether the underwriters are liable for this apportionment or contribution of the Paragon towards the common damage. Now, that collision of ships by accident is a peril of the sea, and that underwriters are liable for the direct injury to the ship insured, which is occasioned thereby, admits of no doubt. The point of difficulty is, whether the amount of the damage apportioned on the Paragon is a direct injury, occasioned by the collision. If it can and ought to be so treated, then the underwriters are liable for the loss. If, on the other hand, it is to be considered as a mere consequential injury, then the maxim, "Causa proxima, non remota, spectatur," applies, and the underwriters are exonerated. This question has not, to my knowledge, ever before come under the consideration of the American courts. It has, however, been recently decided in England, in a case, to which I shall presently refer.

But let us see, how it stands in the foreign maritime law; and in the opinion of eminent continental jurists. The French ordinance of 1681 (liv. 3, tit. 6, art. 26), among other things expressly declares, that the insurers shall bear all losses and damages occasioned by collision (abordage). Pothier holds, that, under this clause, the underwriters are liable for all losses occasioned by accident, without the fault of the injured party. Pothier des Assur. note 50. Emerigon holds the same doctrine. 1 Emerig. Assur. c. 12, § 14. And no doubt seems to have been entertained by either of them, that the loss, for which the insurers were liable, included the damages apportioned upon the vessel, arising from the collision, whether done di-

rectly to itself, or to the other vessel. Emerigon expressly says: "In the case of a rustic judgment (judicio rustico), where the damage is divided between the two vessels, I believe that the insurers are liable for the part which belongs to the ship insured by them." Id., sub finem (Ed. by Boulay-Paty, 1827), p. 417. In the modern Code of Commerce of France (article 50) the insurer is declared liable for all losses and damages which may happen from fortuitous collision (abordage fortuit). Code Com. liv. 2, tit. 10, art. 350, § 2. In another article (art. 407), it is declared; "In case of collision, if the occurrence was purely accidental, the damage is borne without remedy by the suffering vessel. If the collision proceeded from the fault of one of the masters, the damage is paid by the one who occasioned it. If there be a doubt, which of the two vessels were in fault, the damage is to be repaired at their common expense, in equal portions between them." Id. art. 407. This last case has given rise to a doubt among the French jurists, whether, as the Code is silent as to the liability of the insurers, except in cases of fortuitous collision, the insurers are now liable for the damages apportioned, when there is a doubt as to which vessel is in fault. Boulay-Paty and Estrangin both hold, that, under such circumstances, the loss is to be treated as a fortuitous collision, and the damages are to be paid by the insurers. See 1 Emerig. Assur. pp. 416, 417, c. 13, § 14; note by Boulay-Paty (Ed. 1827); 4 Boul. P. Dr. Com. 14–16; Poth. Assur. par. Estrangin (Marseilles, Ed. 1810) pp. 72, 15, 76, note 50. Now it is not necessary to settle, whether these learned jurists are right or not in their interpretations of the modern French Code. What I desire to state is, that they perfectly concur in the opinions of Pothier and Emerigon, and hold, that the damage to the ship insured not only is to be paid by the insurers, but that the damages assessed upon the ship are to be paid, whether she be the injured ship or not. And certainly it must be admitted, that there is no hardship upon the insurers in adopting such a rule; for it may as often work in their favor as against them; since, if the ship insured be the most injured, they will have the full benefit of the rule.

But there is a late case in England directly on the point. It is De Vaux v. Salvador, 4 Adol. & E. 420. That case, in many respects, resembles the present. The facts were, that the ship, insured by the policy, on which the action was brought, came in collision with a steam vessel, in the river Hoogly, in Bengal, by which each was injured: but the steamer most. The owner of the steamer threatened to proceed in the court of admiralty, at Calcutta, against the vessel injured; and the claim was referred to an arbitration; and it was awarded, that each ship should bear half the joint expenses of the two. The ship insured was detained at Calcutta for some time to repair the damages sustained by the collision. The insured claimed from the underwriters the amount of the wages and provisions expended during the detention to repair, as a general average; and also the sum paid to the steamer by the ship insured. Lord Denman, at the trial, rejected both items, holding the underwriters not liable therefor; and upon a motion for a new trial, his opinion was supported by the court of king's bench. His lordship, in delivering the opinion of the court, first stated, that the wages and provisions in such a case were not a general average by the law of England (in which respect it differs from our law); and then he proceeded to say; "The second point appears to be entirely new, which circumstance is not so strong an argument against it as against the former claim, because the event is likely to have been of much less frequent occurrence." And then, after referring to the case of Fletcher v. Poole [1 Park, Ins. (7th Ed.) p. 89, c. 2,] [2] and the maxim on which he thought the case must rest, "In jure, non remota causa, sed proxima, spectatur," he added; "Such must be understood to be the mutual intentions of the parties to such contracts. Then how stands the fact? The ship insured is driven against another by stress of weather. The injury she sustains is admitted to be direct, and the insurers are liable for it. But the collision causes the ship insured to do some damage to the other vessel. And whenever this effect is produced, both vessels being in fault, a positive rule of the court of admiralty requires the damage done to both ships to be added together, and the combined amount to be equally divided between the owners of the two. It turns out, that the ship insured had done more damage than she has received, and is obliged to pay the owners of the other ship to some amount, under the rule of the court of admiralty. But this is neither a necessary nor a proximate effect of the perils of the sea. It grows out of the arbitrary provision in the law of nations, from views of general expediency, not as dictated by natural justice, nor possibly as consistent with it; and can no more be charged on the underwriters, than a penalty incurred by contravention of the revenue laws of any particular state, which was rendered inevitable by the perils insured against."

This is the whole of his lordship's judgment; and I have cited it at large, from a desire to present the argument in the very words, in which it was pronounced, so that there should be no danger of its true force being misrepresented or misunderstood. Now, I own, that it is not quite satisfactory to my mind. I admit, in the fullest manner, the force and propriety of the maxim, in cases of insurance (for there are many other

---

[2] [From 4 Adol. & E. 427.]

cases of contract, to which it does not apply[3]) "Causa proxima, non remota, spectatur." in ascertaining, whether there is a loss within the policy. My difficulty is in admitting, that the case before the court was within the true scope of the maxim. It seems to me, that there is an over-refinement in this attempt to apply the maxim; and I cannot but think, that there is much danger, too, in so applying it to mercantile transactions. Suppose the case of a capture of a neutral vessel, and she should be carried in for adjudication, and acquitted upon payment of costs and expenses to the captors; would not the insurers be liable for these costs and expenses? There is no doubt, that they would, if the capture was one of the perils insured against; and yet it might be said, and truly said, that the capture was not the necessary or immediate cause of these costs and expenses. They were the act of the court, founded upon an arbitrary rule, or an exercise of judicial discretion. Suppose the case of the insurance of a neutral ship against capture only, and after a capture, she were lost by a peril of the sea; would not the case be a total loss by capture, notwithstanding the proximate cause was a peril of the sea? Suppose a steam ship insured against all perils but fire; and having caught fire, the fire was extinguished only by the sinking of the ship at sea; would it not be deemed a loss by fire, within the policy? Suppose a vessel is shipwrecked upon a barbarous coast, and is there set fire to by the natives, and thus destroyed; to what cause would the loss be attributed, to the perils of the sea, or to fire? The former would be a peril acting directly on the subject-matter, from which the ship was not delivered when the other proximate peril was superinduced. Hahn v. Corbett, 2 Bing. 205. Take a case still nearer to the present, of a contribution for a general average, or salvage. Neither of these losses is expressly within the words of the common policy. Yet the underwriters are liable therefor, although not directly stated among the enumerated perils. The contribution of other interests (such as the ship, the freight, and the other cargo) to a jettison, occasioned by the perils of the sea, cannot be said to be a necessary or proximate effect of these perils. It is a charge resulting from the perils insured against, and attaching to these interests, as a burden, by reason of these perils. But then the contribution is the result of a rule of the maritime law, which imposes the charge; and independently of that rule, there is no necessary or natural connection between the perils, which induced the jettison, and the contribution made by the other property. In a metaphysical sense, the proxi-

---

[3] Suppose a factor should deposit the goods of his principal in an improper place, where they were destroyed by an accidental fire, he would be liable for the loss; and yet the fire was the proximate cause of the loss.

mate cause of the contribution is the rule of the maritime law, and the more remote cause is the perils of the seas. So, in cases of salvage. The expenses and charges of salvage, in cases of shipwreck or of other calamities and injuries to the ship by the perils of the seas, have, as their proximate cause, the labors and services performed by the salvors; and have no necessary or natural connection with those perils, although they are properly results or incidents, which may be subsequently attached thereto.

We all know, that when a ship is obliged to put away to a port of necessity by losses or injuries in a storm, which constitute a general average, the wages and provisions and other expenses of the crew, to and at the port of necessity, constitute a part of the general average. Why? Not because they are the proximate effects of those losses or injuries; for the storm, which occasioned the general average, has ceased; but because they are charges, which follow, as a legal result, from the original perils. When the thing insured becomes, by law, directly chargeable with an expense, or contribution, or loss, in consequence of a particular peril, the law treats that peril, for all practical purposes, as the proximate cause of such expense, contribution, or loss. Pothier lays it down, as in his opinion a clear result of the contract of insurance, that the underwriters are bound to pay, not only the direct loss occasioned by a peril insured against, but all the expenses, which follow as a consequence therefrom. Poth. de Assur. note 49. Estrangin (a very excellent commentator on Pothier) asserts, that there is not the slightest doubt on the subject. "L'usage et la loi ont toujours soumis les assureurs à supporter les frais, qui sont la suite d'une fortune de mer, comme les pertes directes occasioneés par l'evenement." Id. Estrangin, note. And this is the unequivocal opinion of Emerigon, as we have already seen. 1 Emerig. Assur. pp. 414–417, c. 12, § 14, and Boul.-P. Comm. (Ed. 1827). And it is to be observed, that these learned foreign jurists found themselves, not so much upon any peculiarities of their own Ordinances, as upon general principles, applicable to the contract. Their reasoning turns upon this proposition, that the insurers are not only to pay the loss from a peril insured against, but must also pay the expenses and charges incident to, and flowing from the direct loss, as a part thereof. "Ces frais extraordinaires," says Pothier, "sont, pour le marchand, qui a fait assurer, une perte, qui lui est causée par une fortune de mer." I confess, that I have always hitherto supposed this to be also the doctrine of our law. Whatever expense, charge, or contribution flows as a natural or a legal consequence from a peril insured against, I have supposed to be a loss within the policy, as being, within the meaning of the maxim, a proximate effect. I am aware of the bearing of the cases of Fletcher v. Poole [supra],

and Eden v. Poole [1 Term. R. 132, note]; 2 Marsh. Ins. bk. 1, p. 721, c. 16, § 5; and Robertson v. Ewer, 1 Term R. 127. But taking the provisions of the ship to be, as they are generally valued, as a part of the ship and her outfit, I find it difficult (as indeed Mr. Marshall did), to reconcile these cases with Brough v. Whitmore, 4 Term R. 206, and if I were obliged to follow the rule laid down in one or the other of these decisions, I should follow that in Brough v. Whitmore. In America, it has not been necessary to decide the point, on which these cases turned, as the wages and provisions in such cases are a general average. The case put by his lordship, that the underwriters would not be liable for a penalty, incurred by a contravention of the revenue laws of any particular state, which was rendered inevitable by perils insured against, does not strike me with the same force as it did his lordship, unless he meant a penalty in personam, and not a forfeiture operating upon the thing insured. In this latter view, I should say, "Nil agit exemplum, litem quod lite resolvit." Suppose by the laws of a country shipwrecked vessels were declared to be forfeited to the government, either directly, or as a consequence of the utter impossibility of complying with the revenue laws, arising from the shipwreck, it would, as I think, be difficult to maintain, if the perils of the seas were insured against, that the underwriters would not be bound to pay the whole loss, and not merely the direct injury done by the shipwreck. The case of Hahn v. Corbett, 2 Bing. 205, appears to me fully to support this opinion.

The difficulties which met the court in the case of De Vaux v. Salvador [4 Adol. & E. 420], and were not overcome, appear to me to be these: First, the loss, or charge, or contribution (call it which you may) occasioned by the collision, was, by the mere operation of law, a direct, positive, and proximate loss, or charge, or contribution, attached to the ship, eo instanti, that the collision took place. It was, in no just sense, a remote consequence of the collision; but a part of the injury done to the Paragon herself. Secondly, it was not a mere personal charge, but a charge in rem. The Paragon was directly liable therefor; and the charge thus attached to her, constituted, to that extent, a direct diminution of her value, pro tanto. It was, debitum in præsenti, solvendum in futuro. Suppose, by the laws of Hamburg, in case of a fortuitous collision, both vessels had (upon a principle of territorial policy), been declared forfeited to the government; and the forfeiture had been enforced against the Paragon; would there not have been a total loss arising from the collision? Hahn v. Corbett certainly goes to that extent. In every way, in which I can contemplate the case of De Vaux v. Salvador, with the greatest respect and deference for the learned judges, who decided it, I confess myself unable to yield to its authority. It is confessedly a novel application of the maxim, "In jure, non remota causa, sed proxima, spectatur." Lord Bacon has indeed stated the reason of the maxim to be, that "it were infinite for the law to consider the causes of causes, and their impulsion, one of another. Therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree." But that great man, conscious of the difficulties attendant upon metaphysical refinements on the subject, qualified this observation with another. "Also, you may not confound the act with the execution of the act; nor the entire act with the last part of the consummation of the act." And of this he puts divers examples, one of which I will cite: "If a lease for years be made, rendering rent, and the lessee make a feoffment of part, and the lessor enter, the immediate cause is from the law in respect of the forfeiture, though the entry be the act of the party. But that is but the pursuance and putting in execution of the title, which the law giveth, and therefore the rent or condition shall be apportioned." What greatly strengthens my doubts is, that such jurists as Emerigon, and Boulay-Paty, and Pothier, and Valin, and Estrangin, treat this as a clear case of liability of the insurers, under the terms of the policy, not, as I have before remarked, upon any peculiarity of the French law, but upon the general principles of the maritime law, acting on the contract of insurance. They treat the whole loss, in a case of this sort, to be a loss suffered by the ship, for which she is liable by a proceeding in rem, and to that extent damnified by the perils insured against. Suppose, in the present case, proceedings had been instituted in rem for the contribution for the collision (as they might well have been), and in the course of the proceedings the Paragon had been sold to satisfy the charge, I confess that I am unable to see how the insurers could escape the payment for a total loss, any more than they could in the case of a sale of the ship to pay salvage, arising from a peril insured against. There is one circumstance in the case before the court, in which it differs from that of De Vaux v. Salvador. It is that the amount or contribution was fixed by a judicial decree against the ship, not directly, indeed, but indirectly; for a stipulation was given, to prevent actual proceedings in rem against her. But I do not know that this circumstance ought to make any difference in the principle which ought to govern us. I certainly attach no weight to it. Upon the whole, my judgment is, that the defendants are liable upon this policy for the contributory amount paid by the Paragon on account of the collision, as a direct, positive, and proximate effect from the accident.

[NOTE. Upon the question whether in this case the contributory amount paid by the Paragon on account of the collision was a direct, posi-

tive, and proximate effect from the accident, in such sense as to render the defendants liable therefor, the judges were opposed. It was therefore certified to the supreme court for a final decision. The supreme court decided that the contributory amount paid by the Paragon was a direct, positive, and proximate effect from the accident, in such sense as to render the defendants liable therefor upon the policy. 14 Pet. (39 U. S.) 99.

[Pursuant to the order of this court, a reference was had to an auditor to ascertain and adjust the loss. On the coming in of the report, exceptions were filed, which were overruled by the court, and the report confirmed. Case No. 11,034.]

PETERS (WHEATON v.). See Case No. 17,-486.

PETERSBURG JUDGES OF ELECTION (UNITED STATES v.). See Case No. 16,-036.

PETERSBURG R. CO. (ATKINS v.). See Case No. 604.

PETERSBURG R. CO. (KEPPEL v.). See Case No. 7,722.

PETERSON (BAKER v.). See Case No. 776.

PETERSON v. The JAVA. See Cases Nos. 7,232–7,234.